UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CHRISTOPHER PAVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:03-CV-662 RM |
| vs. | ) | |
| | ) | |
| P. CONLEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

On August 23, 2010, United States Magistrate Judge Christopher A. Nuechterlein issued a report and recommendation in which he recommended that Christopher Pavey's case be dismissed without prejudice for failure to exhaust administrative remedies as 42 U.S.C. § 1997e(a) requires. Mr. Pavey filed timely objections to the report and recommendation.

In this long-running case, Mr. Pavey alleges that correctional officers at Indiana's Maximum Control Facility ("MCF") used excessive force against him during an October 14, 2001 cell extraction. The case twice was appealed to the court of appeals. *See* Pavey v. Conley, 170 Fed. Appx. 4, 2006 WL 509447 (7th Cir. Feb. 1, 2006) ("Pavey I*")*; Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008) ("Pavey II"). Most recently, the court of appeals remanded for this court to resolve factual disputes about the defendants' exhaustion defense. Pavey II, 544 F.3d at 742-743.

On June 3, 2010, the magistrate judge conducted an evidentiary hearing. The magistrate judge fully set forth the witnesses and evidence presented at the hearing. so they will be recounted here only where necessary to the court's

analysis. Based on the testimony and evidence presented, the magistrate judge found that Mr. Pavey did not properly exhaust his administrative remedies before filing suit. (DE 167.) In doing so, he made an adverse credibility determination against Mr. Pavey, choosing instead to credit the testimony of the defendants in significant part. (*Id.*)

The court's review of the contested portions of the magistrate judge's report and recommendation is *de novo.* 28 U.S.C. § 636(b)(1)(C). The court may "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." FED. R. CIV. P. 72(b)(3). The court isn't required to hold further hearings to review the magistrate judge's findings simply because witness credibility is at issue. *See* United States v. Raddatz, 447 U.S. 667, 673-676 (1980).

Mr. Pavey's filing raises the following three objections to the report and recommendation: (1) "The R&R Errs in Finding that Defendants Have Shown By a Preponderance of The Evidence that Mr. Pavey Failed to Exhaust Available Administrative Remedies"; (2) "The Report and Recommendation Errs In Finding That Mr. Pavey Failed to Exhaust His Administrative Remedies Because Mr. Pavey Properly Grieved to Several Prison Officers"; (3) "The Report and Recommendation Errs In Finding That Mr. Pavey Failed to Exhaust His Administrative Remedies; Defendants Failed to Establish That Mr. Pavey Did Not Reasonably Believe He Had Done All That Was Necessary To Comply With The Prison Grievance Procedure." (DE 168.) All three of these objections are of a general nature, and essentially

2

object to the recommended outcome rather than pointing this court to specific areas where the magistrate judge misconstrued the law or the facts. Nevertheless, the court will attempt to address each of Mr. Pavey's contentions.

A recurring theme throughout Mr. Pavey's filing is that the evidence demonstrated that he "orally grieved" by complaining to staff about the cell extraction. (*See* DE 168 at 2, 10, 13-14.) There is no process by which an inmate may "orally grieve" a matter. The Supreme Court has made clear that exhaustion under the Prison Litigation Reform Act "means using all steps that the agency holds out, and doing so *properly.*" Woodford v. Ngo, 548 U.S. 81, 90 (2006) (emphasis in original). Thus, to exhaust properly, a prisoner must comply with the prison's procedural requirements. Id.; Bridges v. Gilbert, 557 F.3d 541, 555 n.4 (7th Cir. 2009). "[U]nless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred." Pozo v. McCaughtry, 286 F.3d 1022, 1023 (7th Cir. 2002).

Indiana Department of Correction ("IDOC") policy requires the inmate to submit and sign a grievance in writing on the appropriate form. (DE 168-1, IDOC Admin. Proc. 00-02-301, Sect. I(D), XIV-XV; *see also* Tr. at 14.) An inmate who cannot write may obtain assistance from staff or another offender to complete the form. (IDOC Admin. Proc. 00-02-301, Sect. XIV-XV; Tr. at 13-15.) But there is no procedure by which an inmate can "orally grieve," and to the extent Mr. Pavey argues that he exhausted properly merely by orally complaining to prison staff, that argument is unavailing under Woodford.

The question then becomes whether the evidence showed that Mr. Pavey specifically asked for prison staff assistance to complete a written grievance. In deciding that Mr. Pavey didn't make such a request, the magistrate judge concluded, based on inconsistencies in his testimony and his demeanor on the stand, that Mr. Pavey wasn't a credible witness. The magistrate judge's assessment of Mr. Pavey's demeanor is entitled to special deference. *See* Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985) (only the judge who observed the witness "can be aware of the variations of demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). Mr. Pavey doesn't present any specific reason why the magistrate judge's credibility determination based on his demeanor should be overturned, nor can this court discern any basis to do so on the record.

Although this court didn't have an opportunity to observe Mr. Pavey personally during his testimony, the record depicts an inmate attempting to manipulate the facts to explain his failure to file a timely grievance. Mr. Pavey was no stranger to the grievance process. At the hearing, he acknowledged having filed some fifteen grievances at MCF before the cell extraction.[1] (Tr. at 83, 85-86.) He knew, then, that initiating the process entailed completing and signing a specific form. Indeed, Mr. Pavey grieved this incident on the appropriate form in January

---

[1] Mr. Pavey claimed that the guard involved in the cell extraction had been angry at him for filing multiple grievances accusing him of misconduct. (Tr. at 75.)

4

2002, but by then the grievance was too late.[2] (DE 164-1; *see also* Tr. at 86.) As Mr. Pavey made a point of bringing out at the hearing, he was able to obtain and file the proper forms to pursue an administrative appeal of the disciplinary sanction imposed against him for his own actions during the cell extraction. (DE 159-1; DE 159-2; Tr. at 81-82.) Thus, the record shows that Mr. Pavey was both fully aware of the formal grievance process and fully capable of bringing his various concerns to prison personnel through the proper channels. With that in mind, the court considers his testimony.

Mr. Pavey offered vague and in some instances inconsistent testimony at the hearing about his efforts to pursue a formal grievance in connection with this incident. In his summary judgment submission, he identified six people from whom he claimed to have requested assistance filing a formal written grievance: case manager Pamela Bane, Sgt. Brenda Jackson Nalls, Lt. Duane Surney, Capt. Steven Gallegos, Lt. Donnald Gambrel, and Maj. George Payne. (DE 39-2 at 9.) At the hearing, he only testified about speaking to Sgt. Nalls, Lt. Surney, Lt. Gambrel, and Maj. Payne. (Tr. at 67-88.) Mr. Pavey might have had conversations with some prison staff in which he complained about the cell extraction, but the court agrees with the magistrate judge's conclusion that Mr. Pavey didn't ask any of these individuals for help initiating a formal grievance.

---

[2] Under the grievance policy, Mr. Pavey could have sought an extension to file his grievance, but there is nothing to indicate that he did so. (*See* DE 168-1, IDOC Admin. Proc. 00-02-301, Sect. XVIII.)

Mr. Pavey testified that he told Sgt. Nalls that what happened to him during the cell extraction "wasn't right" and that "something should be done." (Tr. at 71.) This testimony, even if believed, doesn't show that he asked Sgt. Nalls for help preparing a formal grievance. Mr. Pavey didn't testify specifically that he asked Sgt. Nalls for help filing a formal grievance, and she was certain that he didn't ask her for any such assistance. (*See* Tr. at 71; Tr. at 23.) There is nothing in the record from which it could be inferred that Sgt. Nalls should have understood Mr. Pavey as requesting her help with filing a grievance. Sgt. Nalls testified that as a custody staff member, she had nothing to do with the grievance process. (Tr. at 19.) She further testified that inmates frequently make oral complaints to her or ask to see her superior, but that this wasn't in any way the equivalent of filing a grievance. (Tr. at 24.) As she put it, "The one thing has nothing to do with the other." (*Id.*) Indeed, Mr. Pavey's own account shows that he believed Sgt. Nalls was going to help him initiate an internal affairs investigation, not a grievance: he testified that Sgt. Nalls told him she would let Lt. Surney know about his complaint because he had "previously worked on internal affairs investigation[s]" and "would know more about how to go about dealing with it." (Tr. at 71.)

Mr. Pavey next testified that he spoke with Lt. Surney a few hours after speaking with Sgt. Nalls, and provided him with details about the cell extraction. He testified that at the end of the discussion Lt. Surney told him he would "write up a report and turn it over to Major Payne to have it looked into." (Tr. at 73.) Again, Mr. Pavey didn't testify that he asked Lt. Surney specifically for help filling

6

out a formal grievance. (*See* Tr. at 71-73.) During questioning by his attorney, Mr. Pavey was asked what type of "report" he thought Lt. Surney was going to file, and he answered, "I can't recall. I had assumed he was referring to either an investigation report or a grievance." (Tr. at 73.) Mr. Pavey's vague suggestion that he thought Lt. Surney was going to complete a grievance form on his behalf and turn it in to Maj. Payne wasn't credible since he testified later in the hearing that he knew grievances didn't go to Maj. Payne.[3] (*See* Tr. at 83.)

Mr. Pavey offered wavering testimony about the substance of a meeting he claims to have had with Maj. Payne and Lt. Gambrel in Maj. Payne's office. On direct examination, he testified that Maj. Payne initiated the meeting because he "wanted to know my side of the story." (Tr. at 75.) He testified that at the end of the meeting Maj. Payne told him he would "look into it," which Mr. Pavey took to mean that Maj. Payne was going to have the incident "investigated." (Tr. at 77.) Again, Mr. Pavey didn't say anything about a grievance. (*See* Tr. at 74-78.) When pressed by defense counsel on cross-examination, Mr. Pavey answered "yes" when asked whether he had ever requested that Maj. Payne help him file a formal grievance. (Tr. at 84.) Given the other evidence in the record and the magistrate

---

[3] For his part, Lt. Surney couldn't remember whether a meeting with Mr. Pavey had occurred. (Tr. at 25-36.) Lt. Surney's testimony was quite vague, and it is apparent that he had little to no recollection of these events or even of IDOC policies and forms used within the prison. At the time of the hearing, Lt. Surney had not worked for the IDOC for more than eight years. (Tr. at 33.) His vague testimony wasn't persuasive evidence for either side.

judge's observations of Mr. Pavey's demeanor, Mr. Pavey's testimony on this point is not credible.

Maj. Payne couldn't specifically remember whether a meeting with Mr. Pavey had occurred, a fact that might otherwise be remarkable except that more than eight years passed between the underlying events and the evidentiary hearing. (*See* Tr. at 53.) Maj. Payne testified that he has daily contact with 50 to 60 inmates, and the court finds nothing unusual about his lack of specific memory of a meeting with Mr. Pavey, who left the facility shortly after this incident in 2001. (Tr. at 53, 84-85.)

Assuming such a meeting occurred, it is clear from the record that neither Maj. Payne nor Lt. Gambrel had anything to do with the grievance process.[4] (Tr. at 42-62.) Lt. Gambrel oversaw the conduct adjustment board, which later imposed disciplinary sanctions against Mr. Pavey for his role in the cell extraction, and he frequently sat in with Maj. Payne on interviews with inmates. (Tr. at 42-49.) Maj. Payne testified that it was quite common for inmates to request an interview with him when they had a complaint, and he also was charged with the

---

[4] Mr. Pavey places much significance on minor details of the meeting, including his claim that Maj. Payne and Lt. Gambrel took photographs of him with a polaroid camera. (*See* DE 168 at 11-12.) Both men denied that they ever took photos of any inmate. (Tr. at 49, 58.) Given the passage of time, Mr. Pavey may simply be confused about when and where the photos were taken, as it appears likely that photos were taken of him by prison staff at some point after the cell extraction. (*See* Tr. at 46- 47, 57-59.) Even if Mr. Pavey is to be believed about who took the photos, it's unclear how this helps him. As explained herein, that he had a meeting with Maj. Payne doesn't alone show that he properly initiated the formal grievance process.

8

task of independently reviewing every incident involving the use of force by guards. (Tr. at 53, 57, 59-62.) Either of these scenarios was just as likely to have led to a meeting like the one Mr. Pavey described, and neither scenario had anything to do with the formal grievance process.

Lt. Gambrel testified definitively no inmate, including Mr. Pavey, ever asked for his help in filling out a grievance form. (Tr. at 45, 50.) Given the passage of time, Maj. Payne couldn't say with certainty that Mr. Pavey didn't ask him for help in filing a grievance. (Tr. at 53-54, 63.) The court agrees with the magistrate judge that in offering this testimony, Maj. Payne simply was trying to be cautious and truthful in spite of his lack of memory. While it might be possible that Mr. Pavey requested such assistance from Maj. Payne, based on the evidence in the record, it is not probable that he did so.

Several of the defense witnesses offered uncontradicted testimony that custody staff had no involvement with the formal grievance process. (Tr. at 19, 38-39, 45.) They also testified that if an inmate had asked them for help filing a formal grievance, they would have directed him to non-custody staff like a counselor or the designated grievance specialist. (Tr. at 19, 38-39, 45.) Maj. Payne testified convincingly that if an inmate had asked him for assistance filling out a grievance during a meeting in his office, he would have contacted the grievance specialist, whose office was down the hall from his, and asked her to provide assistance. (Tr. at 53-56.) There is no evidence of that having occurred in this case. Furthermore, the record shows that Mr. Pavey would know that custody staff

9

had nothing to do with the grievance process because he had filed multiple grievances before. He also knew that grievances didn't go to Maj. Payne. (Tr. at 83.)

If Mr. Pavey wanted to file a formal grievance about the events underlying this case, there would have been no reason for him to go any further than Ms. Bane, a case manager charged with taking inmate complaints. Ms. Bane was making daily rounds speaking with inmates in Mr. Pavey's unit during this period, and she was fully available to help an inmate complete a grievance form if he was unable to do so on his own. (Tr. at 10-13.) She testified that she couldn't recall any inmate ever asking her for such assistance. (Tr. at 12.) Nor did Mr. Pavey testify that he ever asked Ms. Bane for help; indeed, he did not mention Ms. Bane at all during his testimony. His omission is telling, given that Ms. Bane was one of the few individuals at the prison whose job function involved taking formal complaints from inmates. His lack of testimony on this point is particularly suspect given that he claimed to have asked Ms. Bane for help at the time of summary judgment. (DE 39-2 at 9.) In short, Mr. Pavey's testimony that he asked Maj. Payne or any of the other custody staff for help filing a formal grievance was highly improbable, and the magistrate judge did not err in rejecting it.

The evidence before this court demonstrates that although Mr. Pavey might have orally complained to prison staff about the cell extraction, he did not initiate the formal grievance process. He clearly knew the difference between the two. The defendants have established that there were administrative remedies available to

10

Mr. Pavey which he never pursued. For these reasons, the court **OVERRULES** the plaintiff's objections, **ADOPTS** the report and recommendation of the magistrate judge, and **DISMISSES** this case **WITHOUT PREJUDICE** for failure to exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a).

SO ORDERED

ENTERED: November  12 , 2010.

/s/ Robert L. Miller, Jr.
Judge
United States District Court